IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>REAL PROPERTY LOCATED AT 10401 HAWKS HAVEN ROAD, CEDAR RAPIDS, LINN COUNTY, IOWA,<br><br>Defendant,<br><br>and Concerning<br><br>DOLORES WASHBURN,<br><br>Claimant. | No. C10-0162<br><br>RULING ON MOTION FOR SUMMARY JUDGMENT |

## TABLE OF CONTENTS

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    A.   Donald K. Washburn's Criminal Record . . . . . . . . . . . . . 3
    B.   Property at 10401 Hawks Haven Road . . . . . . . . . . . . . . 4
    C.   Donald Washburn's Criminal Activity . . . . . . . . . . . . . . 5
        1.   DiBocca Dice Game . . . . . . . . . . . . . . . . . . . . . 5
        2.   Mining Scheme . . . . . . . . . . . . . . . . . . . . . . . 6
    D.   Dolores Washburn's Involvement . . . . . . . . . . . . . . . . 6
        1.   Iron Ore International Account #XXXXXX9965 . . . . . . . . . 7
        2.   Dolores Washburn's Personal Account #XXXXXX7244 . . . . . 8
        3.   Dolores Washburn's Personal Account #XXXXXX6266 . . . . . 9
    E.   Donald Washburn's Credit Union Account . . . . . . . . . . . . . . 11

IV.   LEGAL STANDARD FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . 12

| | | |
|---|---|---|
| V. | DISCUSSION | 13 |
| | A. Does 10401 Hawks Haven Road Constitute, or is it Derived from, Proceeds Traceable to Wire Fraud? | 14 |
| | B. Was 10401 Hawks Haven Road Used for Money Laundering? | 17 |
| | C. Affirmative Defenses | 17 |
| VI. | ORDER | 18 |

## I. INTRODUCTION

This matter comes before the Court on the Motion for Summary Judgment (docket number 24) filed by the United States on May 1, 2012; the Resistance (docket number 31) filed by Claimant Dolores Washburn on June 5, 2012; and the Reply (docket number 32) filed by the United States on June 12, 2012. Pursuant to Local Rule 7.c, the motion will be decided without oral argument.

## II. PROCEDURAL HISTORY

On December 20, 2010, Plaintiff United States of America filed a verified complaint for forfeiture *in rem*, asking that property known locally as 10401 Hawks Haven Road, Cedar Rapids, Iowa, be forfeited to the United States. It is alleged that the property constitutes or is derived from proceeds traceable to wire fraud and money laundering. On January 31, 2011, Dolores Washburn filed a verified claim of interest in the property, stating that she is the owner. Dolores Washburn filed an answer to the complaint on March 28, 2011.

On June 29, 2011, the Court adopted a proposed Scheduling Order and Discovery Plan submitted by the parties. In reliance on the pretrial deadlines established in the Order, a bench trial was scheduled before Chief Judge Linda R. Reade on April 16, 2012. With the consent of the parties, however, on March 16, 2012 the case was reassigned to the undersigned magistrate judge for the conduct of all further proceedings, pursuant to 28 U.S.C. § 636(c).

The trial was continued and new pretrial deadlines were established. Trial is now scheduled for August 20, 2012. On May 1, 2012, the United States timely filed the instant motion for summary judgment.

### III. RELEVANT FACTS

#### A. Donald K. Washburn's Criminal Record

On February 23, 2012, a jury returned a verdict finding Donald K. Washburn – the husband of Dolores Washburn – guilty of 29 counts of wire fraud, 5 counts of money laundering, and 13 counts of making false statements to his United States probation officer.[1] *See United States v. Donald K. Washburn*, No. 1:11-cr-00100-LRR (N.D. Iowa). Sentencing is currently scheduled for August 23, 2012. As a consequence of Donald Washburn's criminal activity, the United States seeks forfeiture of the property at 10401 Hawks Haven Road. Additional details regarding Donald Washburn's criminal activities, and Dolores Washburn's knowledge of those activities, will be set forth below.

Donald Washburn was previously convicted of ten counts of wire fraud and two counts of money laundering in 2005.[2] Dolores Washburn admits that she knew her husband was convicted and sentenced in 2005 and "was aware of a conviction for a counterfeiting some time in the 1970s," but denies that her knowledge of the prior convictions is "probative on the issue of her innocent owner defense."[3] Dolores also states that her husband's 2012 conviction "would not be probative of her knowledge."[4]

---

[1] *See* Verdict Forms, App. at 53-112.

[2] *See* Judgment, App. at 48-52.

[3] Dolores Washburn's Response to Government's Statement of Facts (docket number 31-2) at 2-3; ¶¶ 9-10.

[4] *Id.* at 3; ¶ 11.

3

## B. *Property at 10401 Hawks Haven Road*

The property which is the subject of this forfeiture proceeding – 10401 Hawks Haven Road, Cedar Rapids, Iowa – is owned and occupied by the Claimant, Dolores Washburn. It was previously owned in conjunction with her husband, Donald Washburn. The details regarding the Washburns' acquisition of the property are somewhat unclear to the Court. According to documents provided by Dolores Washburn in resistance to the instant motion for summary judgment, the Washburns held a mortgage on the property in 1981.[5] The Washburns released the mortgage and disclaimed any interest in the property in August 1983.[6] In June 1986, the Washburns purchased the property from Stevens Investments on a real estate contract.[7] In 1992, the Washburns gave a mortgage on the property to the Moyer and Bergman law firm, which was released in 1993.[8] In July 1994, the Washburns received a deed to the property in satisfaction of the real estate contract with Stevens Investments.[9] In January 1995, the Washburns transferred ownership in the property to Dolores Washburn only.[10]

In June 2000, a mortgage on the property was given to Chase Mortgage Company (or its predecessors). At her deposition on March 9, 2012, Dolores Washburn testified that she "took out the mortgage" to buy a John Deere tractor for the acreage and to pay bills. According to Washburn, she could not recall the amount of the mortgage, nor did

---

[5] *See* Real Estate Mortgage (1st page only), App. at 299.

[6] *See* Disclaimer and Release, App. at 300-301.

[7] *See* Real Estate Contract – Installments, App. at 302-303.

[8] *See* Mortgage, App. at 304-307 and Release, App. at 308.

[9] *See* Special Warranty Deed, App. at 309.

[10] *See* Quit Claim Deed, App. at 113.

she recall any details regarding the purchase of the tractor.[11] In July 2005, Chase assigned its interest in the mortgage to a "friend" of the Washburns, Lloyd Steffensmeier.[12] The Washburns then apparently made payments directly to Steffensmeier. In November 2005, the mortgage was released.[13] Dolores Washburn testified at her deposition that she does not know how much is owed to Steffensmeier, nor does she recall when the last payment was made.[14]

### C. Donald Washburn's Criminal Activity

Donald Washburn's most recent criminal activity is described in an affidavit given by Special Agent Shauntay Lett of the Federal Bureau of Investigation (FBI) in support of the instant motion for summary judgment.[15] Special Agent Lett describes the circumstances leading to Donald Washburn's conviction on 29 counts of wire fraud, 5 counts of money laundering, and 13 counts of making false statements to his United States Probation Officer.

#### 1. DiBocca Dice Game

Donald Washburn fraudulently enticed persons to invest in a gambling dice game called DiBocca. Washburn did not disclose that he "had been convicted in 2004-2005 of fraudulently obtaining investments for a dice game."[16] In promoting his scheme, Washburn "maintained two office spaces [at 10401 Hawks Haven Road] where he

---

[11] *See* Dep. of Dolores Washburn, App. at 30; 17:1-19:1.

[12] *See* Assignment of Real Estate Mortgage, App. at 114.

[13] *See* Release of Mortgage, App. at 115.

[14] Dep. of Dolores Washburn, App. at 30; 19:2-20.

[15] *See* App. at 238-269.

[16] Aff. of Special Agent Shauntay Lett, App. at 240; ¶ 8.

5

conducted much of his illegal business and maintained voluminous records."[17] One investor paid $324,000, a "large majority" of which was used to purchase an airplane. The plane was then used as collateral by Washburn's son for a bank loan, and the bank has since foreclosed on the plane.[18] The same investor later paid an additional $100,000, $90,000 of which was sent by wire transfer to Dolores Washburn's account on May 4, 2009.[19] An additional $7,330 was sent by wire transfer to Dolores Washburn's account on the following day.[20]

### 2. Mining Scheme

Donald Washburn also fraudulently induced persons to invest in the Beverly Mine, the Cumberland Mine, and the Willow Creek Placer Mine. On November 20, 2009, Donald Washburn caused Articles of Organization to be filed in Nevada for Iron Ore International, LLC.[21] On December 16, 2010, Donald Washburn filed a Certificate of Organization for Iron Ore International, LLC with the Iowa Secretary of State.[22] Donald Washburn then used bank accounts in his name and in Dolores' name to facilitate his scheme to defraud investors.

### D. Dolores Washburn's Involvement

The Government claims the payments made to Steffensmeier were proceeds from Washburn's fraudulent activity. The Government also asserts these payments constituted money laundering, and because Donald Washburn engaged in wire fraud from his home office, the property at 10401 Hawks Haven Road was used to facilitate the criminal

---

[17] *Id.* at 241; ¶ 10.

[18] *Id.* at 242; ¶ 13.

[19] *Id.* at 243; ¶¶ 16-17.

[20] *Id.*; ¶ 18.

[21] *See* Articles of Organization, App. at 116-18.

[22] *See* Certificate of Organization, App. at 119-21.

activity. The Government further asserts that Dolores Washburn "was involved in portions of the scheme and otherwise chose to remain oblivious to her husband's activities in the home they shared for many years."[23] Specifically, the Government asserts that three bank accounts owned by Dolores were directly involved in the wire fraud.

### 1. Iron Ore International Account #XXXXXX9965

On August 5, 2009, Dolores Washburn opened a Wells Fargo bank account (#XXXXXX9965) under the name Iron Ore International, with an initial deposit of $200 in cash.[24] Donald Washburn became a cosigner on the account on April 2, 2010, after his federal supervised release was terminated on March 10, 2010.[25] When asked at her deposition why the account was opened in her name, Dolores responded that her husband "had very bad health," and "he thought that we were going to accumulate a lot of money in that account by selling the iron ore and he just wanted to make sure that my name was on it in case something happened to him."[26] Dolores had no explanation, however, regarding why Donald Washburn's name was not included on the account initially.[27]

Deposits and withdrawals in the Iron Ore International account are summarized in an exhibit identified in Donald Washburn's criminal trial.[28] In February 2010, $5,000 from Daniel Chartro was deposited, with a check to Donald Washburn for the same amount issued the following day. In April 2010, $4,000 in cash was deposited, with a

---

[23] Motion for Summary Judgment (docket number 24) at 3; ¶ 7.

[24] *See* Dolores Washburn's Response to Government's Statement of Facts (docket number 31-2) at 5; ¶ 19. *See also* Business Account Application, App. at 122-25.

[25] *Id.* at 6. *See also* Addendum to Certificate of Authority, App. at 126, and Order Terminating Supervised Release, App. at 127.

[26] Dep. of Dolores Washburn, App. at 35; 38:1-6.

[27] *Id.*; 38:8-10.

[28] *See* Summary Exhibit, App. at 131-134.

check in the same amount issued to Chad Washburn the following day. On June 10 and 11, 2010, five deposits were made totaling $25,000. Over the next several weeks, Donald Washburn withdrew cash in excess of $11,000. Additional amounts were expended on a variety of items, including what appear to be travel expenses. On June 24, an additional deposit was made in the amount of $10,000. The account was closed on July 31, 2010, with a cashier's check written to Dolores Washburn in the amount of $16,737.01. The deposits apparently came from investors cheated by Donald Washburn in the mining scheme.[29]

### 2. Dolores Washburn's Personal Account #XXXXXX7244

From December 19, 2008 through June 3, 2010, a total of $10,031 in cash was deposited into Dolores Washburn's personal Wells Fargo account #XXXXXX7244.[30] This account was used to make some of the payments owed to Steffensmeier. For example, on November 7, 2008, $650 in cash was deposited into the account and on November 12, 2008, Dolores Washburn wrote a check to Steffensmeier in the amount of $650.[31] In her response to the Government's statement of facts, however, Dolores notes that direct payroll deposits reflect "more than enough funds to cover the November 12, 2008 check made out to Steffensmeier."[32] In her deposition, Dolores had no explanation

---

[29] Aff. of Special Agent Shauntay Lett, App. at 249; ¶ 35.

[30] *See* Dolores Washburn's Response to Government's Statement of Facts (docket number 31-2) at 8; ¶ 33. *See also* Declaration, App. at 155.

[31] *See* Check from Dolores Washburn to Lloyd Steffensmeier dated 11-12-08, App. at 156.

[32] Dolores Washburn's Response to Government's Statement of Facts (docket number 31-2) at 8; ¶ 34. *See also* Account Statement, App. at 157-58.

8

regarding why she would have deposited cash in the exact amount of the check, when the balance in the account was otherwise sufficient to cover the check.[33]

On May 12, 2009, a $3,000 check was written to Dolores Washburn on a "DiBocca Corporation" account, and signed by her son, Chad Washburn.[34] When asked at her deposition to "tell me what is DiBocca Corporation," Dolores responded "I don't know."[35] Dolores could provide no explanation as to why she would have received a $3,000 check from DiBocca Corporation in May 2009.[36] The memo line of the check contains the word "mileage," but in response to the Government's statement of facts, Dolores asserts that "[i]t is not established who wrote 'mileage' in the memo."[37]

### 3. Dolores Washburn's Personal Account #XXXXXX6266

Dolores Washburn also maintained a second low-balance account at Wells Fargo (#XXXXXX6266). On February 17, 2009, $20,000 was wired to the account by Sue Hannah, identified as one of the investors in Donald Washburn's mining scheme.[38] The next day, the account was used to purchase three cashier's checks payable to Don Washburn in the amounts of $4,000, $5,000, and $5,000.[39] Also on that date, the account was used to fund a cashier's check in the amount of $3,616, payable to the Linn County

---

[33] Dep. of Dolores Washburn, App. at 32; 28:1-25.

[34] *See* Check from DiBocca Corporation to Dolores Washburn dated May 12, 2009, App. at 159.

[35] Dep. of Dolores Washburn, App. at 33; 31:9-11.

[36] *Id.*; 31:12-14.

[37] *See* Dolores Washburn's Response to Government's State of Facts (docket number 31-2) at 8; ¶ 36.

[38] *See* Transaction Report, App. at 166.

[39] *See* Account Statement, App. at 168-69 and "Official Check[s]," App. at 170-72.

Treasurer.[40] At her deposition, Dolores testified that she believed the check to the Linn County Treasurer was used to pay property taxes on the property at Hawks Haven Road.[41] Dolores professed ignorance, however, regarding what her husband did with the $14,000 in cashier's checks payable to him.[42]

On May 4, 2009, $90,000 was wired to the account from Michael Bauer, identified as a victim of Donald Washburn's DiBocca dice game fraud.[43] On the same day, Dolores wrote a check to Don in the amount of $80,000.[44] On the following day, May 5, 2009, Bauer wired an additional $7,330 to the account.[45] Also on May 5, Dolores transferred $5,000 from this account to her other personal account (#XXXXXX7244), and she wrote a check to Lloyd Steffensmeier in the amount of $650.[46] On May 6, Dolores used the account to write a $250 check to Hawks Haven Road Association.[47] The account statement also shows a debit on May 7 to "Chase Epay" in the amount of $8,825.84.[48]

---

[40] See "Official Check," App. at 173.

[41] Dep. of Dolores Washburn, App. at 37; 45:19-22.

[42] Id.; 45:23-46:2.

[43] See Account Statement, App. at 174-75, and Transaction Reports, App. at 176-77.

[44] See Check from Dolores Washburn to Don Washburn dated May 4, 2009, App. at 179.

[45] See Transaction Report, App. at 178.

[46] Id., and Check from Dolores Washburn to Lloyd Steffensmeier dated 5-5-09, App. at 180. (An additional check for $650 was written on April 28, but the Court was unable to determine whether it was also written to Lloyd Steffensmeier.)

[47] See Check from Dolores Washburn to Hawks Haven Rd. Association dated 5-6-09, App. at 185.

[48] See Account Statement, App. at 175.

10

### E. *Donald Washburn's Credit Union Account*

The Government claims Donald Washburn also used his Veridian Credit Union account to facilitate his illegal activities. A summary of the activity in the Veridian account was introduced as an exhibit at Washburn's criminal trial.[49] In September 2009, Robert Lee wired $60,000 to the account.[50] In October 2009, Michael Bauer wired $35,000 to the account.[51] In November 2009, Jeff Lee wired $74,000 to the account.[52] In June 2010, Robert McClure wired $5,000 to the account.[53] On July 1, 2010, R&M Plastic Recycling, LLC, a company owned by Ralph "Keith" McClure, wired $25,000 to the account.[54] R&M Plastics wired an additional $10,000 on July 2.[55] According to the affidavit of Special Agent Lett, Michael Bauer was a victim of Donald Washburn's DiBocca dice game fraud, while Robert Lee, Jeff Lee, Robert McClure, and Keith McClure were all victims of Washburn's mining scheme.[56]

The Government claims that the money fraudulently obtained by Washburn was used, in part, to pay expenses related to 10401 Hawks Haven Road. Specifically, on September 14, 2009, Donald Washburn wrote a check to Dolores Washburn in the amount

---

[49] *See* Summary Exhibit, App. at 190-96.

[50] *See* Statement of Accounts, App. at 187-88, and FedPayments Manager, App. at 189.

[51] *See* Statement of Accounts, App. at 208, and FedPayments Manager, App. at 209.

[52] *See* Summary Exhibit, App. at 192.

[53] *See* Statement of Accounts, App. at 218, and FedPayments Manager, App. at 219.

[54] *See* Statement of Accounts, App. at 221-23, and "Past Messages," App. at 224.

[55] *See* Statement of Accounts, App. at 221-23, and "Past Messages," App. at 225.

[56] *See* App. at 238-269.

of $2,500, with "taxes" written on the memo line.[57] On September 16, Washburn wrote a check to Lloyd Steffensmeier in the amount of $650, with "house payment" written on the memo line.[58] On July 2, 2010, Washburn purchased five counter checks payable to Lloyd A. Steffensmeier, in the amount of $650 each.[59] On July 8, Washburn purchased another check in the amount of $650, payable to Lloyd Steffensmeier, and a check for $1,190 payable to the Linn County Treasurer.[60] At her deposition, Dolores Washburn testified that she was not "sure," but she believed that the checks to Lloyd Steffensmeier represented "mortgage" payments.[61] On August 2, 2010, Donald Washburn purchased another counter check in the amount of $650, payable to Lloyd A. Steffensmeier.[62]

## IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute as to a material fact "'exists if a reasonable jury could return a verdict for the party opposing the motion.'" *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Humphries v. Pulaski County Special School District*, 580 F.3d 688, 692 (8th Cir. 2009)). A fact is a "material fact" when it "might affect the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to

---

[57] *See* Check from Donald K. Washburn to Dolores Washburn dated September 14, 2009, App. at 197.

[58] *See* Check from Donald K. Washburn to Lloyd Steffensmeier dated September 16, 2009, App. at 201.

[59] *See* Transaction Record, App. at 229-230.

[60] *See* Transaction Record, App. at 231. (The identical record is found at page 233 of the Appendix.)

[61] Dep. of Dolores Washburn, App. at 41; 61:18-62:17.

[62] *See* Transaction Record, App. at 237.

establish the existence of a genuine dispute as to a material fact, the non-moving party "'may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Communications, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Instead, the non-moving party "'must substantiate [her] allegations with sufficient probative evidence that would permit a finding in [her] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873); *see also Anderson*, 477 U.S. at 248 (A nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party."). "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

## V. DISCUSSION

The United States claims the property at 10401 Hawks Haven Road is subject to forfeiture for two reasons: First, the Government asserts the property "constitutes or is derived from proceeds traceable" to Donald Washburn's wire fraud and is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). Second, the Government asserts the property was used for money laundering and is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A). In her answer to the complaint, Dolores Washburn denies the material allegations and affirmatively asserts an "innocent owner defense," pursuant to 18 U.S.C. § 983(d). In her resistance to the instant motion for summary judgment, Dolores Washburn also argues that a forfeiture in this case would be "constitutionally excessive," citing 18 U.S.C. § 983(g).

### A. Does 10401 Hawks Haven Road Constitute, or is it Derived from, Proceeds Traceable to Wire Fraud?

There is substantial evidence that Dolores Washburn's husband, Donald Washburn, engaged in wire fraud. Some of the details regarding Donald Washburn's criminal activity are described in an affidavit by FBI Special Agent Shauntay Lett. A jury recently found Washburn guilty of 29 counts of wire fraud. Indeed, Dolores does not seriously contest the allegations regarding Donald's criminal activities.

Instead, Dolores argues that the property at 10401 Hawks Haven Road does not "constitute proceeds traceable to wire fraud," nor was the property "derived from proceeds traceable to wire fraud." The Washburns purchased the property on contract in June 1986, more than 20 years prior to Donald Washburn's recent criminal activity. In July 1994 – approximately 15 years prior to Donald Washburn's recent criminal activity – the Washburn's received a deed to the property in satisfaction of the real estate contract. The property was apparently owned "free and clear" at that time.

In June 2000, a mortgage on the property was given to Chase Mortgage Company. The mortgage was assigned to Lloyd Steffensmeier in July 2005 and then released a few months later. The obligation to Steffensmeier apparently remained, however, and the evidence suggests that proceeds from Donald Washburn's fraudulent schemes were used to make payments on the loan. In addition, proceeds from the criminal activity was apparently used to pay other expenses associated with the property. The Court's review of the evidence reveals the following payments:

| DATE | PAYMENT | AMOUNT | ACCOUNT | APPENDIX |
|---|---|---|---|---|
| 11-12-08 | Check to Steffensmeier | $650.00 | WF #7244 | p. 156 |
| 02-18-09 | Cashier's check to Linn Co. Treas. | 3,616.00 | WF #6266 | p. 173 |
| 05-05-09 | Check to Steffensmeier | 650.00 | WF #6266 | p. 180 |
| 05-06-09 | Check to Hawks Haven Rd Ass'n | 250.00 | WF #6266 | p. 185 |
| 06-05-09 | Check to Steffensmeier | 650.00 | WF #6266 | p. 186 |

| DATE | PAYMENT | AMOUNT | ACCOUNT | APPENDIX |
|---|---|---|---|---|
| 09-16-09 | Check from Don to Dolores | 2,500.00 | Veridian | p. 197 |
| 09-16-09 | Check from Don to Steffensmeier | 650.00 | Veridian | p. 201 |
| 07-02-10 | 5 bank checks to Steffensmeier ($650 each) | 3,250.00 | Veridian | pp. 229-30 |
| 07-08-10 | Bank check to Steffensmeier | 650.00 | Veridian | p. 231 |
| 07-08-10 | Bank check to Linn Co. Treas. | 1,190.00 | Veridian | p. 231 |
| 08-02-10 | Bank check to Steffensmeier | 650.00 | Veridian | p. 237 |

In his affidavit, Special Agent Lett asserts – without citation to any documentation – that Donald Washburn made the "house payment" from August 2008 through April 2009, and again from August 2009 through January 2010.[63]

In summary, the following facts appear to be undisputed: In July 1994, the Washburns owned the property "free and clear." In January 1995, the Washburns transferred ownership in the property to Dolores Washburn only. In June 2000, the Washburns borrowed money to purchase a tractor and pay other bills. (While there may be some dispute regarding the purposes for which the money was put, it is apparently undisputed that it was not used to purchase the property.) The note promising to repay the loan (which is not part of the record) was secured by a mortgage given to Chase Mortgage Company (which is also not part of the record). In July 2005, Chase assigned its interest in the mortgage (and presumably in the note) to Lloyd Steffensmeier. The mortgage was then released. Since that time, proceeds traceable to Donald Washburn's wire fraud have been used to pay on the note now held by Steffensmeier. That is, proceeds from Donald Washburn's criminal activity was not used to purchase the property. Instead, it was used to repay money borrowed to purchase a tractor and pay other bills. The promise to repay the loan was initially secured by a mortgage on the property, but the mortgage had

---

[63] *See* Aff. of Special Agent Shauntay Lett, App. at 267-68; ¶¶ 87-89.

15

apparently been released by the time the proceeds from the unlawful activity was paid on the note.

The parties routinely refer to the payment to Steffensmeier as a "house payment" or a "mortgage payment." If Dolores Washburn is to be believed (and for purposes of the motion for summary judgment the Court assumes the truth of her testimony), then the payments to Steffensmeier may be more accurately described as the "tractor payment." Furthermore, there is no evidence that Steffensmeier holds a mortgage on the property to secure the Washburns' obligation on the loan. Commonly, a person may borrow money to purchase a house, sign a promissory note, and also sign a mortgage, pledging the house as security for the note. Payments on the loan are commonly called "house payments," or more colloquially, "mortgage payments." That is not the case here. The loan in 2000 was used to purchase a tractor and pay other bills. While the loan was initially secured by a mortgage signed by the Washburns, the mortgage has since been released and the note has been assigned to Steffensmeier. That is, it appears to the Court that the obligation of Steffensmeier is not secured by the property at 10401 Hawks Haven Road. Accordingly, payments to Steffensmeier are not properly considered "house payments" or "mortgage payments." Based on the record submitted with the motion for summary judgment, the payments to Steffensmeier do not appear to have any legal connection to the property at 10401 Hawks Haven Road.[64]

The Court has not disregarded the allegation that proceeds from Donald Washburn's fraudulent activities were used to pay real estate taxes on the property, or make a payment to the "road association." The Court concludes, however, that there are genuine issues of material fact regarding these payments and, furthermore, their legal effect regarding

---

[64] Attached to the Government's Reply are documents suggesting Steffensmeier may have intended to reserve a security interest in the property. The Court notes, however, that Steffensmeier has not filed a claim in the forfeiture proceeding, asserting any purported interest in the property. At most, there is a genuine issue of fact in dispute regarding whether the loan to Steffensmeier is a lien on the subject property.

forfeiture is unclear. Accordingly, the Court concludes Plaintiff is not entitled to summary judgment on this ground.

### B. Was 10401 Hawks Haven Road Used for Money Laundering?

Alternatively, the Government asserts that the property was "involved in" Donald Washburn's illegal money laundering. Specifically, the Government points to the payments to Steffensmeier, the road association, and the Linn County Treasurer. The Government asserts that "[i]t is these very transactions that are the 'corpus' of the money laundering violation and thus, because the defendant real property is involved in such transactions, the defendant real property is forfeitable under 18 U.S.C. § 981(a)(1)(A)."[65]

As set forth above, the Court believes there is a genuine issue of material fact regarding whether the payments to Steffensmeier are, in any legal sense, payments related to 10401 Hawks Haven Road. The payments are apparently made in satisfaction of a loan used to purchase a tractor and pay other bills. Apparently, there is no mortgage on the property securing the loan obligation. The cases cited by the Government in its brief appear to be distinguishable in that the illegal proceeds in those cases were used to purchase the forfeitable property or otherwise used to pay off a lien on the property. Here, the proceeds from Donald Washburn's illegal activity were not used to purchase the property at 10401 Hawks Haven Road, nor were they apparently used to pay a lien on the real property. To the extent payments for real estate taxes or to the road association may be considered money laundering, the Court finds there are genuine issues of material fact regarding the payments. Accordingly, the Government is not entitled to summary judgment on this ground.

### C. Affirmative Defenses

As set forth above, the Court concludes that the Government is not entitled to summary judgment on its forfeiture complaint. Accordingly, the Court finds it

---

[65] *See* Brief in Support of Motion for Summary Judgment (docket number 24-8) at 49.

unnecessary to determine at this time whether Dolores Washburn would be entitled to relief under the "innocent owner defense" or whether forfeiture of the property in this case would be "constitutionally excessive."

## VI. ORDER

For the reasons set forth above, the Motion for Summary Judgment (docket number 24) filed by the United States is **DENIED**.

DATED this 20th day of July, 2012.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA